**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John Ewing DARROW and Cecil Dale Pierce, Defendants-Appellants.**

**Nos. 72-2043, 72-2044.**

United States Court of Appeals, Seventh Circuit.

Heard April 1, 1974.

Decided June 20, 1974.

---

William H. Baughman, Jr., Arthur Connick, Law Students, Francis X. Beytagh, Jr., and Leslie G. Foschio, Notre Dame Law School, Notre Dame, Ind., for defendants-appellants.

Stanley B. Miller, U. S. Atty:, William F. Thompson, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and CUMMINGS and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

In March 1972, an indictment was returned against defendants Darrow and Pierce charging violations of 18 U.S.C. § 472.[1] Count I was against Pierce alone and alleged that he had a $20 bill (Se-

---

1. 18 U.S.C. § 472 provides:

"Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

ries 1969, serial number F29392932A) in his possession on March 19, 1972, knowing that it was counterfeit and with intent to defraud. Count II charged both defendants with having in their possession on the same day 31 counterfeit $20 bills (same series and serial number as above) with like knowledge and intent. Count III charged both defendants with passing a counterfeit $20 bill (same series and serial number) to Herbert Clifford on March 18, 1972. Both defendants filed motions to suppress and waived a jury trial. The motions to suppress were granted in part. After a bench trial, Pierce was found guilty of all three counts and Darrow guilty of the two counts involving him. Pierce received a 5-year concurrent sentence on each count, but the court suspended 4 years and 9 months of the sentence and placed him on probation for that period. Darrow received a similar sentence on the two counts involving him.

The facts disclosed at the trial reveal the following: Both defendants patronized the Dry Dock Tavern in Indianapolis, Indiana, shortly after midnight on the morning of March 19, 1972. After they ordered drinks, Darrow paid for them with a $20 bill. Waitress Alice McNicholas noticed that the bill did not have a serial number and brought this to the attention of the tavern manager. He concluded that the bill was counterfeit and asked the waitress to "stall" in making change while he called the police.

Darrow then dropped his drink and demanded his change. Thereafter, both defendants approached the bar and requested their change. When the police arrived, the defendants were identified to them. One police officer testified that defendants were arguing about their change when he arrived. In view of the disturbance being caused, defendants were first arrested for disorderly conduct.

After the police arrived, Mrs. McNicholas found six counterfeit $20 bills in a beer case where the defendants had been standing at the bar. She turned them over to the manager of the tavern. He turned all seven bills over to the police. No charges were brought concerning these bills.

When the defendants were escorted from the bar, they were searched for weapons. Large amounts of legitimate cash were found in their pockets, and a set of Oldsmobile car keys was also found in Darrow's pocket. These items were then returned to defendants. Nothing was found when their back pockets were patted down. Upon request for identification, defendants gave the officers their Kentucky drivers' licenses. One of the police officers then searched the tavern parking lot for a car bearing Kentucky license plates. When he found it, he attempted to ascertain its owner by having repeated announcements made at the tavern, finally inquiring individually of the remaining patrons and employees, but no one claimed the car.

At the request of the local police, a Secret Service agent arrived at the tavern and inspected the bogus bills. He also looked inside the locked Kentucky automobile and observed a rolled-up sock in a trash container in the front seat.

Approximately fifteen minutes after the police arrived at the tavern, defendants were driven to the Indianapolis Police Department and brought to the basement lockup. In accordance with standard police procedure, defendants were again searched. Officer Osborn noticed a $20 bill in the right rear pants pocket of Pierce. He removed the bill and determined it was counterfeit and returned to the tavern to present it to the Secret Service agent. This bill is the subject of Count I.

At 3:00 a.m., the Kentucky Oldsmobile was removed from the tavern parking lot to police headquarters. Some time after 8:00 a.m., the police and Secret Service agent obtained a search warrant and then unlocked Darrow's car in order to conduct an inventory of its contents. Upon opening the sock from the trash container in the front seat, one of the officers discovered 20 additional coun-

terfeit bills and later discovered eleven other counterfeit $20 bills rolled in a pack of Raleigh cigarettes that had been on the sun visor of the car. These 31 bills are the subject of Count II.

The evidence also disclosed that defendants were at the Kraft Standard Service Station around 8:00 p.m. on March 18, in Darrow's Oldsmobile. Darrow was the driver and Pierce was the sole passenger. Darrow requested that a quart of oil be poured into the motor. Both defendants then entered the station and Pierce chose a novelty license plate that was for sale. Darrow paid for the oil and the novelty with a $20 bill. Half an hour later, Herbert Clifford, the attendant, noticed the difference between a genuine $20 bill in his possession and the $20 bill that Darrow had given him. Clifford turned the suspect bill over to the station owner the next afternoon, and he turned it over to the Secret Service on the evening of March 20. This bill was the subject of Count III.

All the bills were admitted into evidence and bore the same serial number, except the first $20 bill given to Mrs. McNicholas by Darrow; it had no serial number.

### Seizure of $20 Bill from Pierce

Pierce contends that the bill supporting Count I was the fruit of an unlawful disorderly conduct arrest and should have been suppressed. The bill was obtained by the Government when officer Osborn noticed it in Pierce's rear pants pocket at the police station, after the bartender had given the police the original counterfeit bill passed by Darrow.

 Pierce's contention must fail. The trial judge made no finding as to the validity of defendants' original arrest for disorderly conduct, because when they arrived at the police station, they were also arrested for the felonious possession of counterfeit money with intent to put it into circulation in violation of Ind.Code § 35–1–124–5 (Burns Ind.Stat.Ann. § 10–1204). We agree with the trial judge that the police officers had probable cause to believe that defendants were committing a felony in violation of this Indiana statute. Consequently, if the bill protruding from Pierce's rear pocket is considered as obtained from a warrantless search, it was a reasonable search incident to arrest within the Fourth Amendment. United States v. Edwards, 415 U.S. 800, 94 S. Ct. 1234, 39 L.Ed.2d 771; United States v. Robinson, 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427; Gustafson v. Florida, 414 U.S. 260, 266, 94 S.Ct. 488, 38 L.Ed.2d 456; Chimel v. California, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 23 L. Ed.2d 685.

### Seizure of Thirty-one $20 Bills from Darrow's Car

Defendants next assert that Darrow's car was searched under a search warrant based on an invalid affidavit. The affidavit stated:

"Officer, Phillip Ezzell, I.P.D. has good cause to believe that concealed in or about a certain 1971 Oldsmobile automobile is a sum of counterfeit U. S. money to wit: counterfeit twenty dollar bills.

"I recieved [sic] a call to check a possible passing of forged $20.00 bills in the early hours of March 19, 1972 at the Dry Dock Tavern 151 E. Washington Street, Indianapolis, Marion, County, Indiana. The owner called in a complaint stating that two men were causing a disturbance over return of change from a $20.00 bill which the tavern owner believed to be counterfit [sic]. Upon my arrivail [sic] I found two male subjects causing a disturbance and placed John Darrow and Cecil Pierce under arrest for D.O.C. and placed a call to the Secret Service. *Upon arrival the agent confirmed that the bill in question was counterfit [sic] as were several others in the possession of the two subjects. In a conversation with the subject John Darrow he informed me that he had a car in which he had come to the tavern and that he*

*had additional currency.* I ordered the car taken to Police Headquarters where it is at this time.

"The car to be searched is a 1971 Olds 442 Black over red mfg. serial number 34487m182563 bearing Kentucky plate number 887435 (Union County). It is located at Police H.Q. on north Alabama Street and I wish to search the entire vehical [sic]." (emphasis added)

We have italicized the key sentences under attack by defendants. There is ·a serious question whether the first of these sentences is true, whether it can be fairly construed to refer to the bill found in Pierce's pocket and the six bills found in the beer case, and whether the affiant intended it to be so construed. As to the second sentence, the conversation referred to was suppressed by the district judge because it took place in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. This presents the question, seemingly of first impression in the federal courts, whether the exclusionary rule of *Miranda* and other cases applies to probable cause determinations. In United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed. 2d 561, the Supreme Court decided not to extend the Fourth Amendment exclusionary rule to grand jury proceedings. On the other hand, in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341, n. 19, applying the "evidence derived therefrom" language of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2518(10)(a)), the Court suppressed evidence secured pursuant to a warrant, where the warrant application had included information obtained in violation of Title III. Cf. Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182; United States v. Harrison, 265 F.Supp. 660 (S.D.N.Y.1967). Pierce has also called our attention to State v. Lekas, 201 Kan. 579, 442 P.2d 11 (1968), where it

was held that a confession obtained in violation of *Miranda* could not be used for probable cause in the affidavit for a search warrant. A further difficulty with the affidavit is that it does not link Darrow or Pierce to the car described in the last paragraph.

█ . We find it unnecessary to resolve these issues, for under Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419, the officers were entitled to search the car without a warrant. Probable cause existed for the search. In addition to the facts given in the affidavit, the Oldsmobile was originally linked to its owner Darrow by the car keys, Kentucky license plates and driver's license, and the failure of anyone else in the tavern to claim the car after repeated inquiry, and thereafter by the auto registration and bill of sale found on his person. When Secret Service Agent Honess peered into the car on the tavern parking lot, he observed a white rolled-up sock in a waste container in the front seat of.the car. Based on 19 years of experience with counterfeit cases, Honess explained to the police officers that a common method of operation used by the passers of counterfeit notes was to conceal a roll of counterfeit notes in a stocking. As he testified, when counterfeit passers are pursued in automobiles, they seal the bills in a stocking and · throw it out, instead of throwing the bills out of the window where the wind would cause them to go in different directions.[2] Consequently, as the district court concluded, "the officers had independent knowledge of facts sufficient to establish probable cause for the search [even if] relying on an invalid warrant."

Of course, probable cause alone is not sufficient to support a search without a warrant. But this case fits within an exception to the warrant requirement illustrated by the strikingly similar case of Chambers v. Maroney, *supra.* There

2. In United States v. Cool, 461 F.2d 521, 523 (7th Cir. 1972), reversed on other grounds, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335, one of the defendants threw a paper sack containing counterfeit money from her husband's automobile as they followed a police car to the station.

the occupants of a car were arrested "in a dark parking lot in the middle of the night." 399 U.S. at 52, n. 10, 90 S.Ct. at 1981. The police took the car to the station and searched it without a warrant. *Id.* at 44, 90 S.Ct. 1975. The Court concluded that the car remained readily movable, despite the arrest of the occupants and the apparent lack of evidence that anyone was actually coming to pick it up. *Id.* at 51, 90 S.Ct. 1975. It then held:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Id.* at 52, 90 S.Ct. at 1981.

In this case the police did not search the car "immediate[ly]," but United States v. Edwards, 415 U.S. 800, 94 S. Ct. 1234, 1239, 39 L.Ed.2d 771, has since held that items "that were subject to search at the time and place of * * * arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed * * *."

The only other difference between this case and *Chambers* is that here the officers obtained and relied on a warrant which may be invalid, whereas in *Chambers* the warrant process was never invoked. At least on these facts, the officers should not be penalized for going before a magistrate. It would be a different case if the magistrate had denied a warrant, and the officers had thereafter searched in purported reliance on some exception to the warrant requirement. But here the officers did not act in bad faith. We agree with Judge Noland that they are to be commended for seeking a warrant; they should not be required to run the risk that a poorly drafted affidavit will invalidate an otherwise permissible warrantless search.[3]

*Sufficiency of the Evidence*

■■ Pierce argues that the Government did not prove his guilty knowledge and intent to defraud beyond a reasonable doubt. However, the evidence summarized in this opinion's statement of facts strongly suggests that Pierce and Darrow were engaged in a common scheme to pass counterfeit bills. The possibility that Darrow was treating an innocent Pierce to a good time is negated by the fact that Pierce kept good bills in his front pocket and the bad $20 bill in his rear pocket, showing that he knew the difference. Both Pierce and Darrow had a large amount of good currency, suggesting that both were taking change from bad bills. Thus Pierce's entire conduct when the offense was alleged to have been committed was sufficient for the trial court to find that he had the requisite mental state to be guilty of all counts. See United States v. Cervantes, 466 F.2d 736, 740 (7th Cir. 1972); United States v. Browning, 390 F.2d 511, 512 (4th Cir. 1968). Because Pierce was engaged in a common scheme with Darrow to possess and pass counterfeit bills in the Indianapolis area, he had at least constructive possession of the 31 counterfeit bills found in Darrow's car. See United States v. Cool, 461 F.2d 521 (7th Cir. 1972), reversed on other grounds, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335; cf. United States v. Parent, 484 F.2d 726, 732 (7th Cir. 1973).

■ Darrow attacks the sufficiency of the evidence only as to Count III. As already noted, this count charges that Darrow passed a counterfeit $20 bill to Herbert Clifford, a gas station attend-

---

3. We do not reach two separate theories urged by the Government. It was urged that this was a permissible inventory search under Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067. In response to a question by the Court, the Government also argued that the Oldsmobile had been seized pursuant to 49 U.S.C. § 781 et seq. and could therefore be searched under the rationale of United States v. White, 488 F. 2d 563 (6th Cir. 1973).

**70**

ant, on the night of March 18. Besides the evidence of the events occurring at the service station, the district court was entitled to consider the other counterfeit bills found in Darrow's car and the one without a serial number that he had handed to the tavern waitress. Since Darrow's service station transaction was accompanied by other acts inconsistent with innocence, the trier of facts was justified in inferring Darrow's guilty knowledge and intent. United States v. Cool, *supra*.

. Judgments affirmed.